Filed 7/18/23  P. v. Sloat CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079871 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. INF1800297) |
| CANAAN JACOB SLOAT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Dale R. Wells, Judge.  Reversed in part and remanded for resentencing.

Cindi B. Mishkin; and Kevin J. Lindsley, under appointments by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

During a short-lived stay at a Palm Springs substance abuse treatment facility, Canaan Jacob Sloat sexually assaulted a female resident. A jury convicted him of four sex crimes and first degree residential burglary. He was sentenced to serve a prison term of 12 years and eight months.

Sloat does not contend there is insufficient evidence to support the jury's verdict. Rather, he asserts his convictions should be reversed because (1) an unjustified preaccusation delay of 32 months prejudiced his defense, and (2) the trial court erroneously declined to release the victim's privileged treatment records to the defense. We find no merit in either contention.

Sloat raises three issues regarding his sentence. He claims the trial court violated Penal Code[1] section 654 by imposing separate sentences for three of his sex offenses. He also contends he is entitled to remand for resentencing in light of the amendments to section 1170, subdivision (b), enacted by Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567), which limited the court's discretion to impose an upper-term sentence, and because the court erred in failing to determine he had the present ability to pay certain fines and fees imposed as part of his sentence pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). We shall vacate and remand the case for a full resentencing based on Senate Bill 567 error. On remand, under the full resentencing rule, the trial court will have the opportunity to consider Sloat's objections to multiple punishment and his *Dueñas* claim, thus we need not address these claims.

---

[1]	Further unspecified statutory references are to the Penal Code.

2

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

*Conviction Offenses*

Sloat was charged in an information with first degree residential burglary (§ 459; count 1); aggravated assault (§ 220, subd. (a)(1); count 2); sexual penetration by means of force, violence, duress, menace and fear (§ 289, subd. (a)(1)(A); count 3); oral copulation by means of force, violence, duress, menace and fear (§ 288a, subd. (c)(2)(A); count 4); and misdemeanor sexual battery (§ 243.4, subd. (e)(1); count 5). It was further alleged as to count 1 that a person was present in the residence at the time of the offense (§ 667.5, subd. (c)(21)). As to all counts, it was alleged that Sloat had suffered two prior convictions for which he was sentenced to prison within the meaning of section 667.5, subdivision (b). After deliberating for less than three hours, a jury convicted Sloat of all counts charged in the information and returned a true finding on the allegation associated with count 1, based on the evidence we summarize next.

### II.

*Trial Evidence*

A.  *Prosecution Case*

On the evening of June 9, 2015, 21-year-old Jane Doe checked into a residential "detox" facility in Palm Springs operated by a company called Sovereign Health. Three other patients were there when she arrived: Sloat, another man, and a woman named Jackie. Sloat was a "pretty big" guy, 250 to 275 pounds, with a shaved head, tattoos all over his arms and face, and two horns on his forehead. Jane was assigned to share a bedroom with Jackie.

3

The next day, June 10, Jane spent her time watching television, smoking cigarettes, and talking with Sloat. In the evening, Sloat invited Jane to go with him to get beer, in violation of house rules requiring patients to stay clean and sober and remain on facility grounds. Jane declined to go at first because she did not want to get in trouble, but Sloat persuaded her to go. They walked to a gas station, where Sloat went inside and bought four "tall boy" cans of beer. They returned to the house around an hour later, undetected by the house manager on duty, Genevieve H.

Sloat put the beers in a bathroom and drank two of them. Jane went in after Sloat and took "maybe, two or three gulps" from one can of beer. Jane and Sloat then sat in the back patio. Their "conversation was fine at first but then it just went somewhere that [Jane] didn't want it to go." Sloat made "a pass" at her. Although Jane had told Sloat she dated women, Sloat talked about his attraction to Jane. When Jane got up, he tried to hug her. She let him hug her out of "fear" and so "it wouldn't be awkward." She was scared of Sloat, who was "a bigger guy," and she had been scared of him even before he started talking about his attraction to her. She also had difficulty "tell[ing] someone something that could be considered not polite," and she did not know what Sloat was capable of when he was drinking.

Jane decided to remove herself from the situation. She went immediately to Genevieve, who was still on duty, and asked to be moved to a different facility because she "didn't feel comfortable being there" because of Sloat's behavior. Genevieve said she would "get it taken care of" and told Jane to go to her room. Jane did as Genevieve suggested and joined Jackie in their shared bedroom.

At around 3:00 a.m., Jackie was taken to the hospital in an ambulance. There was a period of chaos when everybody in the house was in the

4

backyard.  After Jackie was transported out of the house, Jane went back to her room alone.  Wearing basketball shorts and a sports bra, Jane laid in bed on her right side, facing the wall, with her back to the door.  She heard the bedroom door open but did not move.  In her experience, it was not unusual for a house manager to open the door in the middle of the night.  But she realized it was not the house manager when she felt someone get into bed behind her.

Jane smelled alcohol and knew it was Sloat.  The first thing she felt was "his hand across [her] chest, just groping on [her]."  The front of his body was against her back.  He put his left arm around her and used his left hand to touch her breasts, stomach, "[e]verything."  Jane had not consented to the encounter.  In disbelief, she pretended she was asleep.  Sloat got up, repositioned himself, rolled Jane onto her back, and pulled her shorts and underwear down.  He put his torso between Jane's legs and put his mouth on her genitals.  Jane felt scared and continued pretending she was asleep.  Sloat then "put his fingers inside" of Jane's vagina.

At that moment, the night manager, Jorge "George" A., opened Jane's bedroom door to check on her.  Sloat got off of Jane and jumped up.

When George opened the door, he did not turn the bedroom lights on, so the only light in the room was coming from the hallway.  In a police interview, George said that when he opened the door, he saw Sloat "on [Jane's] bed on top of her.  He wasn't . . . completely on top of her, but he was kind of like up to her stomach area[.]"  At trial, George testified Sloat was kneeling on the floor near the foot of Jane's bed with his body facing towards the bed, and Jane was facing Sloat and "kind of sitting up" in the bed.  Sloat's body was blocking George's view of Jane from the waist down.

5

George stood in the doorway and asked what was going on. Sloat told George everything was "cool." George said he needed to hear from Jane that she was okay. Jane asked George to give her a minute, and George left. Sloat started asking Jane if everything was okay. She "needed a minute to figure out like if everything was okay and it wasn't." All she could think about was getting to her phone to call her father.

After Sloat left the room, Jane put her clothes on and went to the facility office to call her father. When she got to the office, she went inside, locked the door behind her, and told George "[i]t wasn't consensual." She felt "scared" and "[v]iolated." George testified that Jane was crying and seemed "frantic" and "shaken." She was stuttering and "could barely talk." George retrieved Jane's phone from a locker in the office. Jane called her father, who told her to call the police. She did so.

In the meantime, Sloat came to the office door wanting to talk to Jane. He started banging on the door and becoming aggressive. Jane hid behind a desk "so he wouldn't come near [her]." Sloat told George he was leaving the facility and wanted to retrieve his phone from the office. George eventually let him in. Sloat apologized to Jane, but Jane told him to get away from her. Sloat got his phone, packed his belongings, and left the facility.

Police officers responded to the facility later that morning and conducted recorded interviews of Jane and George. George told one of the officers Jane and Sloat were "more or less . . . on the bed and together," and Sloat was on top of Jane with his head "about her torso, stomach area."

Jane underwent a SART (sexual assault response team) examination. In narrating the sexual assault for the SART nurse, Jane described Sloat as "really scary with tattoos everywhere" and "double horns on his head" and said he had kissed her on the shoulder in addition to orally copulating and

6

digitally penetrating her. The nurse found a laceration on Jane's posterior fourchette (the tissue between the anus and opening of the vagina) that was "[h]ighly consistent with digital penetration."

The nurse, guided by Jane's narrative of the sexual assault, swabbed areas where Jane reported that Sloat had kissed her or touched her with his mouth. Forensic testing of swabs of Jane's left upper back and mons pubis showed a mixture of DNA from three individuals. The major contributor was Jane. The amounts contributed by the other two individuals were insufficient to develop a genetic profile. Testing of a swab of the area around Jane's mouth revealed the presence of male DNA, but not enough to develop a full genetic profile.

During her SART exam, Jane denied alcohol use within 12 hours of the assault but admitted voluntary drug use within 96 hours of the assault. She was calm and cooperative and did not appear to the nurse to be impaired by substances in any way. The officer who interviewed Jane also detected no drug or alcohol impairment. However, a subsequent analysis of blood drawn during Jane's SART exam showed the presence of alcohol as well as a small amount of cannabinoids. The amount of alcohol in Jane's system was not consistent with someone who drank only two sips of beer eight hours earlier. Instead, it was likely her blood alcohol level at the time of the sexual assault was between .100 and .180.

B.    *Defense Case*

In June 2015, Genevieve was the lead manager of the detox facility and was responsible for patient care and safety. She had observed Jane and Sloat on the afternoon of June 10. Jane had been "flirting with hands," flipping her hair, and sitting on Sloat's lap. That evening, Jane told Genevieve that Sloat was hitting on her and she felt threatened and uncomfortable. Genevieve

7

told Jane what she could do "to keep herself safe" and instructed her to go to her room and stay there. When George came on duty, Genevieve "pass[ed] down to [George]" her observations of Jane and Sloat, and that Jane had reported feeling threatened, and told George to stay vigilant and monitor them. On cross-examination, Genevieve admitted she had not told the detective about her observations of Jane's flirting, and she admitted she had not noticed Sloat and Jane missing from the facility for at least an hour.

Sloat testified he has difficulty with methamphetamines and alcohol and was "strung out" on June 8, 2015 when he arrived at the detox facility. Jane checked in the next day, and he started spending time with her. Jane told Sloat she had "brought some kief up in her vagina"[2] when she flew on the plane to Palm Springs. On June 10, they smoked the kief. Then, around midnight, he invited Jane to walk to the store to get beer. He purchased four cans of malt liquor. After they got back, he drank two of them, and Jane drank the other two.

Sometime after 3:00 a.m., Jane invited Sloat to "go kick it" in her room. They went to Jane's bedroom and listened to a portable music device while sharing headphones. Sloat did not kiss Jane, put his mouth on her genitals, or insert his finger in her vagina. When George opened the door, he and Jane were listening to music and talking.

Jane "flipped out thinking she was going to get kicked out of the rehab." She went to the office, "drunk and swearing," and got on the phone with her father, who was yelling at her. After two hours of trying to figure

---

[2]     Jane explained that kief is "the powder that comes at the bottom" of marijuana, "[s]ort of like pollen." She also denied bringing kief to the detox facility.

8

out what was going on, Sloat asked for his phone, left the facility, and went to his father's house in Bakersfield.

## DISCUSSION

### I.

### *The Trial Court Did Not Err in Concluding the Preaccusation Delay Did Not Prejudice the Defense*

A.    *The Defense's Motion to Dismiss*

At the close of the prosecution's case-in-chief, Sloat moved for dismissal of the charges based on pre-filing delay.  Although the offenses were alleged to have been committed on June 11, 2015, a criminal complaint was not filed until February 16, 2018, two years and eight months later.  He asserted the delay was prejudicial because it had caused certain witnesses' memories to fade, and had affected his ability to procure certain physical evidence, such as Jane's bed sheets and clothing, which were collected but never tested for DNA, and Jane's blood and urine samples, which had been destroyed.  He asserted that because Sovereign Health was raided by the Federal Bureau of Investigation and its activities were suspended in June 2017, the defense was unable to procure certain records.[3]  And because Sovereign Health shut down, the defense also lost the opportunity to investigate and photograph the crime scene.

---

[3]    Defense counsel did not submit in support of the motion a declaration or other evidence establishing what efforts the defense had made, if any, to obtain records from Sovereign Health.  After trial, the defense received over 1,300 pages of records of Sovereign Health in response to a subpoena it served one week before trial.  This document production was the subject of post-trial motions, the focus of Sloat's second claim of trial error, which we discuss next.

The prosecutor acknowledged there had been a delay in filing charges, and explained it was occasioned by the fact that when the investigating detective tried to retrieve the DNA test results, they had not been recorded in "the system." The prosecution had not received a filing request from law enforcement until June 29, 2017. Charges were then filed on February 16, 2018. The prosecutor contended, however, that the delay had not prejudiced Sloat's defense.

The prosecutor argued that any purported effect of the delay on witness memories was mitigated by the fact that recorded interviews were conducted with each witness almost contemporaneously with the events in the case. Although biological samples taken from the bed sheet and Jane's clothing were not tested, the prosecutor argued there was no evidence these items had been destroyed or that Sloat's trial counsel had ever tried to obtain or test them for DNA. Further, the probative value of testing the bed sheets for DNA was low because a positive result would merely have corroborated that Sloat was in Jane's room, a fact that was not in dispute. With respect to the alleged destruction of Jane's blood and urine toxicology samples, the prosecutor emphasized that although laboratory policy was to retain samples for only two years, there had been no testimony these specific samples had been destroyed. Even if they were destroyed, there was no prejudice to the defense because the prosecution's toxicology results were favorable to Sloat. Thus, the defense failed to establish there was anything to be gained from retesting the samples.

As for the alleged inability to obtain records from Sovereign Health, the prosecutor pointed out that Sovereign Health did not close its doors until July 10, 2018. Sloat was arraigned on the complaint, served with initial discovery, and was represented by the public defender as of March 20, 2018.

10

Thus, Sloat was on notice of the charges and the need for investigation almost four months *before* Sovereign Health closed. Yet there was no evidence establishing what efforts the defense had made to retrieve records from Sovereign Health, or, more importantly, the date when the defense investigator initiated any such search for records. Thus it could not be said whether the asserted unavailability of the records was due to late trial preparation by the defense, or the prefiling delay.

Finally, in response to Sloat's claim he was prejudiced by the inability to investigate the grounds of the Sovereign Health facility, the prosecutor stated that photographs of Jane's bedroom taken close in time to the sexual assault had been provided to defense counsel in 2018. Also, the only feature of the facility that had been changed since the sexual assault was the addition of a window in the office area, and the defense was not prejudiced by this alteration because multiple witnesses had testified about it.

The trial court denied the motion, concluding there was not sufficient evidence of prejudice to justify dismissal of the case for preaccusation delay. It found the delay was attributable to the negligence of law enforcement and was not caused by any intent on the part of the prosecution to obtain an advantage. Because the delay was negligent rather than intentional, a greater showing of prejudice was required to establish a due process violation. Although it was troubled by the delay, the court found "little or no" evidence of prejudice, including because Sovereign Health's records were still available after the case was filed; there was no indication the DNA samples had been destroyed; and although witness memories may have faded, there were recorded statements.

B.    *Analysis*

A delay in filing criminal charges does not implicate a defendant's speedy trial rights.  (*People v. Cowan* (2010) 50 Cal.4th 401, 430 (*Cowan*).)  However, "[w]hen, as here, a defendant does not complain of delay after his arrest and charging, but only of delay between the crimes and his arrest, he is 'not without recourse if the delay is unjustified and prejudicial.  "[T]he right of due process protects a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence."  [Citation.]  Accordingly, "[d]elay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions.  A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay.  The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay." ' "  (*Ibid.*)

" '[W]hether the delay was negligent or purposeful is relevant to the balancing process.  Purposeful delay to gain an advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation.  If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation.' "  (*Cowan*, *supra*, 50 Cal.4th at p. 431.)  " 'We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation], and defer to any underlying factual findings if substantial evidence supports them.' "  (*People v. Jones* (2013) 57 Cal.4th 899, 922 (*Jones*).)  Whether a particular delay was prejudicial to the defense is one

12

of the factual questions reviewed under the deferential substantial evidence standard. (*People v. Alexander* (2010) 49 Cal.4th 846, 874; see *Jones*, at p. 923 [affirming denial of motion where the "evidence of prejudice is speculative"]; *People v. Hill* (1984) 37 Cal.3d 491, 499 ["Prejudice is a factual question to be determined by the trial court."].)

On appeal, Sloat does not challenge the trial court's finding that the delay in filing charges against him was the result of law enforcement negligence. Instead, he contends the court erred insofar as it found he suffered no prejudice from the delay. We conclude that he fails to establish an abuse of discretion.

Rather than address the trial court's specific factual findings, Sloat largely rehashes arguments from his trial court motion. He first contends that George, a "key" defense witness, "seemed unable to recall numerous things" throughout his trial testimony, such as what time Genevieve left the facility after her shift ended; whether "certain doors in the house were opened or closed"; what Jane was wearing after the assault when she was walking toward the office, or whether Jane told him she had been assaulted; whether Genevieve gave him a pass down report regarding Jane; or whether Jane or Sloat smelled like alcohol. But he neglects to explain how George's inability to recall these details " ' "weaken[ed]" ' " the defense. (*Cowan*, *supra*, 50 Cal.4th at p. 430.) Nor do we independently perceive any such prejudice. George's failure to recall the foregoing facts was either innocuous (e.g., whether certain doors were open or closed; what Jane was wearing after the assault) or favorable to Sloat (as with his inability to recall whether Jane told him she had been assaulted); or the information was established through other witnesses (Genevieve or, as to alcohol use, the prosecution's toxicologist).

13

For his second contention, Sloat simply asserts without elaboration that "Jane Doe could not remember a number of things she was asked." We are not required to address such unexplained, undeveloped assertions. (See *People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2 (*Freeman*) [rejecting defendant's claims to the extent they were asserted "perfunctorily" and "without development"].) Even if we were to do so, Sloat fails to acknowledge that Jane (like George) gave a recorded interview to law enforcement, and that the trial court found the availability of the recorded statements to be a mitigating circumstance undermining his claims of prejudice. (See *Cowan, supra,* 50 Cal.4th at p. 433 [prejudice from faded witness memories diminished where contemporaneous police reports existed and could be used to refresh witness's recollection], citing *Scherling v. Superior Court* (1978) 22 Cal.3d 493, 506.) He fails to overcome the court's basis for finding Jane's memory lapses not prejudicial.

Sloat's next contention—from start to finish, that "[the lead detective] could not remember several things, including why he waited so long to submit the case to the District Attorney's Office for prosecution"—is forfeited for the same reason as the previous point. (*Freeman, supra,* 8 Cal.4th at p. 482, fn. 2.) We pass on it without further consideration.

Addressing the asserted loss of forensic evidence, Sloat claims "[t]he DNA samples obtained from the bed sheets and Jane Doe's clothing were never tested *and* [*were*] *subsequently destroyed*" and "[t]he lab samples of Jane Doe's urine and blood *were also destroyed before the complaint was filed*." (Italics added.) In making these claims, Sloat overlooks that the prosecutor argued, and the trial court found, no independent evidence of any destruction of DNA evidence. His only support for the claim that DNA evidence was destroyed is a citation to his trial counsel's argument in support

14

of the motion to dismiss.  Attorney argument is not evidence.  (*People v. Barajas* (1983) 145 Cal.App.3d 804, 809.)  To the extent he maintains that the failure to *test* the sheets or clothing was prejudicial, he fails to cite evidence connecting the absence of such testing to the prefiling delay.  He also fails to explain why the defense could not have conducted any such testing itself.  (See *Cowan*, *supra*, 50 Cal.4th at pp. 431–432 [showing of prejudice was weak where the defense had the ability to examine and test forensic evidence underlying prosecution's case].)  As for the biological samples, apart from asserting they were destroyed, Sloat does not attempt to demonstrate how their asserted destruction was prejudicial, nor do we independently perceive that it was given that Jane's toxicology results favored the defense rather than the prosecution.

Finally, Sloat asserts he was unable to obtain documents from Sovereign Health because of the preaccusation delay.  But in making this assertion, he ignores that Sovereign Health did not shutter its facilities until July 10, 2018, nearly four months after Sloat was assigned counsel and arraigned on March 20, 2018.  Implicit in the trial court's finding that Sovereign Health's records were still available after the case was filed is that Sloat failed to carry his burden of demonstrating that his initially-appointed counsel could not have obtained the records in the exercise of reasonable diligence before Sovereign Health closed.  (See *Cowan*, *supra*, 50 Cal.4th at p. 430 [" ' "A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay." ' "].)

In his reply brief on appeal, Sloat asserts for the first time that discovery of Jane's privileged records would not have been possible at the pretrial stage pursuant to *People v. Hammon* (1997) 15 Cal.4th 1117 (*Hammon*).  (See *id.* at p. 1127 [providing that the Sixth Amendment does not

15

guarantee pretrial discovery of privileged psychotherapeutic information].) Sloat did not raise this argument in the trial court nor in his opening brief on appeal, he does not attempt to demonstrate good cause for his failure to raise the point sooner, and the People have had no opportunity to respond to it. As a result, the argument is forfeited. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1218–1219 [" '[i]t is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party' "].)

It is also unpersuasive. As the party moving to dismiss, Sloat had the burden of demonstrating " ' "prejudice arising *from the delay*." ' " (*Cowan*, *supra*, 50 Cal.4th at p. 430, italics added.) Although Sloat's trial counsel asserted that he had been unable by the time of trial to obtain any records from Sovereign Health, counsel failed to indicate what, if anything, he had done to procure the records, or when he had done it—including whether any document search was commenced early or "in late preparation for this trial." The prosecutor argued that in the absence of such evidence, the asserted inability to obtain records could not be attributed to the prefiling delay. These same points apply equally to Sloat's belated reply brief argument. His claim that *Hammon* precluded *pretrial* discovery of Sovereign Health records begs the question what evidence, if any, was presented to the trial court at the time of the hearing of the efforts that had then been made to procure the records for *trial*. Sloat has cited no such evidence, and our own review of the record has disclosed none.[4] (See *Jones*, *supra*, 57 Cal.4th at p. 923 [defense

---

4    As we are about to discuss, Sloat's trial counsel submitted a declaration after trial stating the defense investigator commenced efforts to locate Sovereign Health records in February 2021, less than two months before the start of trial. However, this evidence was not before the court at the time of

showing of prejudice was speculative where it offered no evidence of its efforts to locate the two witnesses it claimed were lost due to prefiling delay].) Thus, notwithstanding Sloat's belated reliance on *Hammon*, it remains the case that the defense did not meet its initial burden of showing evidence of prejudice arising from the preaccusation delay.

Because we conclude the trial court did not abuse its discretion in finding Sloat was not prejudiced by the preaccusation delay, we need not and do not consider Sloat's remaining arguments in which he attempts to establish that the prejudice from the delay outweighed the justification for the delay. (See *Jones*, *supra*, 57 Cal.4th at p. 921 [where "the defendant fails to meet his or her burden of showing prejudice, there is no need to determine whether the delay was justified"]; *People v. Abel* (2012) 53 Cal.4th 891, 910–911 [where the defendant "did not meet his initial burden of showing prejudice resulting from the precharging delay" the prosecution "was not required to show justification for the delay, and the court had no obligation to balance the harm from the delay against the justification"].)

---

the hearing on the motion to dismiss and so we do not consider it here. (See *Cowan*, *supra*, 50 Cal.4th at p. 431 [review of trial court ruling on motion to dismiss limited to considering the evidence "before the court up to [the] time" the defense brought its motion in the trial court].)

## II.

*The Trial Court Did Not Abuse Its Discretion When It Declined to Release*

*Jane's Privileged Treatment Records to the Defense*

A.  *The People's Motion to Quash the Subpoena for Jane's Privileged Treatment Records and Sloat's Motion for New Trial*

According to a declaration filed by Sloat's trial counsel after trial ended,[5] on or about March 26, 2021, the defense investigator served subpoenas duces tecum on an individual and entity the defense believed to be in possession of Sovereign Health's records.[6]  The subpoenas sought "[a]ll medical and mental health records for [Jane's] admission, treatment, progress & follow up"; "[a]ll records pertaining to the alleged incident between [Jane] and Mr. Sloat on 6/11/2015"; and "[a]ll medical and mental health records for Canaan Sloat's admission, treatment, progress, & follow up."  One of the subpoenas had a return date of April 2.  The other had a return date of April 7.  Both required delivery of the responsive records directly to the trial court.  (See Pen. Code, § 1326, subds. (b), (d) (formerly subd. (c)); Evid. Code, § 1560, subd. (b).)

The week after the trial ended, defense counsel received over one thousand pages of records in response to the subpoenas.  In a declaration filed with the court on May 12, 2021 in support of a motion to continue Sloat's scheduled sentencing hearing, defense counsel disclosed that he was in

---

[5]  Trial started on March 30, 2021.  Jane testified on April 1.  The jury reached its verdict on April 15.

[6]  As mentioned in footnote 3 *ante*, the declaration revealed that the defense investigation into "the whereabouts of records that were once held by Sovereign Health in Palm Springs, CA, pertaining to [Jane Doe]" began in February 2021.

possession of the records, that they were "from all of [Jane's] and . . . Sloat's stays at all Sovereign Health facilities,"[7] and that counsel planned to have them duplicated for the prosecution. At a May 14 hearing, at the prosecution's request, the trial judge ordered the defense to surrender the records to the court.

That same day, May 14, the prosecution filed a motion to quash. It argued that Jane's records were confidential and subject to the provisions of Marsy's Law (Cal. Const., art. I, § 28) as well as the statutory psychotherapist-patient privilege (Evid. Code, § 1014). It further argued the subpoenas were not supported by good cause, and that Jane was entitled to (but had not received) advance notice of the service of any subpoena seeking disclosure of her confidential medical and mental health records, citing Code of Civil Procedure section 1985.3 in support of this position.[8]

In response, the defense asserted it was not required to give notice of the subpoenas to Jane under either Code of Civil Procedure section 1985.3 or Marsy's Law. It argued the subpoenas were supported by good cause because there were "numerous inconsistencies" in witness statements that the defense anticipated the responsive records would settle; because the records

_____

[7]     Sovereign Health had other facilities in California as well as in other states. Jane testified she previously had been admitted to another Sovereign Health facility for recovery.

[8]     Code of Civil Procedure section 1985.3, subdivision (e), applies to the service of subpoenas duces tecum for the production of personal records, and requires the subpoenaing party to serve a written notice to consumer that "records about the consumer are being sought from the witness named on the subpoena[.]"

19

would "clear up confusion regarding treatment dates and details"; and because they would contain Jane's "intake and release information."

The reported hearing on the motion to quash went forward on July 16, 2021, in a closed courtroom with defendant, his counsel, and the prosecutor present. The trial court first observed that the subpoenaed records had been delivered directly to defense counsel, who appeared to have had the records photocopied, as he had delivered two sets—the originals plus one copy—to the court. The court observed that defense counsel should not have been in possession of the records because "no notice to consumer" was provided to Jane, who "obviously . . . should have had an opportunity to lodge an objection to those documents being received." The court stated its intent was to go through the records in the presence of counsel, "tell you what I see in the documents," and then permit the defense to seek the release of any confidential documents after giving notice to Jane.

The trial court began its review of the records, noting it had "briefly" gone through them in advance of the hearing and had grouped them into several sets. The first set pertained to Sloat. After obtaining consent from Sloat, the court ordered these records released to defense counsel.

The remaining records—of which there were 1,395 pages—pertained to Jane. The trial court reviewed these records as well, set by set, describing for counsel the type of document (e.g., "Biopsychosocial assessment"), number of pages, date(s) of treatment and facility location, and general content of documents in each set. Most of the records pertained to Jane's treatment in other facilities in 2014 or 2016 (i.e., well before or after the June 11, 2015 sexual assault).

In records of Jane's treatment at the Palm Springs facility (between June 9, 2015 and June 13, 2015) the court found only one reference to the

20

incident—a progress note stating Jane "had [an] incident with other patient" and had been transferred to another facility. The court also found two references to the incident in records relating to Jane's treatment at the facility to which she was transferred after the sexual assault. One entry dated June 14, 2015, apparently quoting Jane, stated, "[J]ust a couple of days ago in a recovery treatment one of the patients tried to rape me." Another entry stated, "Client was [a] victim of a sexual assault approximately four days ago," and described symptoms Jane was reportedly suffering as a result of this incident. The court did not find any other references to the incident within the records of Jane's treatment at these two facilities, and it expressly found there was "no investigative report in there at all."

After completing its review and hearing argument from counsel (including defense counsel's assertion that "[n]o one" but the prosecution had "raised the privilege"), the court ruled: "These documents are privileged. There's no question whether it's physician/patient privilege, the documents are privileged. [¶] To say [Jane] hasn't raised the privilege is a little disingenuous because she couldn't raise an objection to something she didn't know was going on." The court explained to defense counsel it was "not preventing [the defense] from bringing an appropriate motion and giving notice to [Jane] if you wish to do so to try to obtain the release of some of these documents." The court acknowledged it "ha[d] not read everything in the documents" and told defense counsel, "There could be something else. . . . [But] short of a waiver by [Jane] or a motion by you that she is properly noticed of, I won't be revisiting the issue of releasing any of these to you."

No such noticed motion, served on Jane, was filed by the defense. Instead, on August 13, 2021, Sloat filed a motion for new trial. The contours of the motion were expansive and somewhat murky, but the thrust of the

defense argument was that the court should have released Jane's treatment records to the defense at the motion to quash hearing, and that the records (as the defense envisioned them, not as the court had described them) constituted new evidence within the meaning of section 1181, subd. (8).[9]

The trial court denied the motion for a new trial. The court stated it had "walked through [the documents] and . . . read every – there are 1300 pages" and had found "nothing in the documents that was exculpatory at all" and "the few references there were, were more inculpatory than exculpatory." The court explained its "main concern about [the] documents was that the victim in the case did not have the opportunity to object. . . . There was no opportunity for the victim to be aware that her medical records were being sought." The court cited "the principles of Marsy's law" as support for its position the victim was entitled to notice. The court told defense counsel: "I left the door open for you to give [Jane] notice so that she can object. And then we can go forward on it. If you think there's something in those documents that you're entitled to, give her notice. And for some reason or another, you've never given her notice."

B.    *Relevant Legal Principles*

---

9    "When new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as, under all circumstances of the case, may seem reasonable." (§ 1181, subd. (8).)

" 'Documents and records in the possession of nonparty witnesses . . . are obtainable by subpoena duces tecum.' " (*Kling v. Superior Court* (2010) 50 Cal.4th 1068, 1074 (*Kling*); see Pen. Code, §§ 1326, 1327; Evid. Code, § 1560.) "It is important to note, however, that such a criminal subpoena does not command, or even allow, the recipient to provide materials directly to the requesting party. Instead, under subdivision (c) of section 1326, the sought materials must be given *to the superior court* for its in camera review so that it may 'determine whether or not the [requesting party] is entitled to receive the documents.' " (*Facebook, Inc. v. Superior Court (Touchstone)* (2020) 10 Cal.5th 329, 344 (*Facebook*); see *People v. Blair* (1979) 25 Cal.3d 640, 651 [materials produced in response to criminal subpoena cannot legally be given directly to the requesting party].) Any records produced in response to a criminal subpoena are held under seal in order to assure the privacy of the records. (Evid. Code, § 1560, subd. (d); see *Susan S. v. Israels* (1997) 55 Cal.App.4th 1290, 1296 ["the subpoena duces tecum procedure itself implicitly recognizes an expectation of privacy on the part of the person whose records are subpoenaed"].)

An affidavit of good cause is not required to support the issuance of a criminal subpoena. (*Facebook*, *supra*, 10 Cal.5th at pp. 343–344.) However, "in order to *defend* such a subpoena against a motion to quash, the subpoenaing party must at that point establish good cause to acquire the subpoenaed records. In other words . . . at the motion to quash stage the defendant must show 'some cause for discovery other than "a mere desire for the benefit of all information." ' " (*Id.* at p. 344.)

In *Facebook*, our Supreme Court identified seven factors (called the "*Alhambra* factors" because they were originally developed in *City of Alhambra v. Superior Court* (1988) 205 Cal.App.3d 1118) that should be

considered by a court in determining whether good cause has been shown to support enforcement of a subpoena challenged by a motion to quash. They are: (1) "Has the defendant carried his burden of showing a ' "plausible justification" ' for acquiring documents from a third party . . . [o]r does the subpoena amount to an impermissible ' "fishing expedition" '?" (citations omitted); (2) "Is the sought material adequately described and not overly broad?"; (3) "Is the material 'reasonably available to the . . . entity from which it is sought (and *not* readily available to the defendant from other sources)'?"; (4) "Would production of the requested materials violate a third party's 'confidentiality or privacy rights' or intrude upon 'any protected governmental interest'?"; (5) "Is defendant's request timely?"; (6) "Would the 'time required to produce the requested information . . . necessitate an unreasonable delay of defendant's trial'?"; and (7) "Would 'production of the records containing the requested information . . . place an unreasonable burden on the [third party]'?" (*Facebook*, *supra*, 10 Cal.5th at pp. 345–347.)

The defendant in *Facebook* was seeking discovery of private social media messages of an assault victim, in part for the purpose of revealing the victim's propensity for violence, thereby bolstering the defendant's claim of self-defense. (*Facebook*, *supra*, 10 Cal.5th at pp. 338, 349.) The Court explained the relevant plausible justification inquiry would need to "assess whether a claim of self-defense is sufficiently viable to warrant the intrusion that would occur if the sought communications were required to be disclosed." (*Id.* at p. 349.)

Due to the confidentiality interests implicated by production of the requested social media records, the *Facebook* court explained that "the California Constitution, as amended [in 2008] to incorporate Marsy's Law, calls for yet additional special inquiry." (*Facebook*, *supra*, 10 Cal.5th at

24

p. 355; see Cal. Const., art. I, § 28, subd. (b)(4) & (5) [providing that a crime victim has the right "[t]o prevent the disclosure of confidential information or records to the defendant" including records "which disclose confidential communications made in the course of medical or counseling treatment, or which are otherwise privileged or confidential by law" and "[t]o refuse . . . [a] discovery request by . . . any . . . person acting on behalf of the defendant"].) The Court observed that the request for the victim's private communications implicated subdivision (b)(4) and (5) of article I, section 28 of the California Constitution, and that subdivision (c)(1) of section 28 specifically allows the prosecution to enforce a victim's rights to prevent disclosure of such communications. "[T]hese provisions contemplate 'that the victim and the prosecuting attorney would be aware that the defense had subpoenaed confidential records regarding the victim from third parties.' [Citation.] Accordingly, in circumstances like those here it would be appropriate to inquire whether such notice has been, or should be, provided." (*Facebook*, at p. 355.)

In this case, in addition to Marsy's Law, the statutory psychotherapist-patient privilege was identified as a legal basis for preventing the release of Jane Doe's treatment records to the defense. Under Evidence Code section 1014, "the patient, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist[.]" The psychotherapist-patient relationship exists interpersonally as well as "between a psychological corporation [and other listed entities] . . . and the patient to whom it renders professional services[.]" (Evid. Code, § 1014, subd. (c).)

25

Relevant to Sloat's arguments on appeal, in *People v. Reber* (1986) 177 Cal.App.3d 523 (*Reber*), disapproved in *Hammon*, *supra*, 15 Cal.4th at page 1123, the defense issued third party subpoenas before trial seeking discovery of the victims' psychotherapeutic records in order to challenge their credibility on cross-examination at trial by showing the alleged crimes were actually the product of the victims' delusions or hallucinations. The trial court precluded the defense from obtaining confidential communications between the victims and their psychotherapists. The Court of Appeal held this was error, reasoning that "adherence to a statutory privilege of confidentiality must give way to pretrial access when it would deprive a defendant of the constitutional right of confrontation and cross-examination." (*Reber,* at p. 531.) To protect the defendants' right of confrontation, the trial court should have "(1) obtain[ed] and examine[d] in camera all the materials under subpoena, (2) weigh[ed] defendants' constitutionally based claim of need against the statutory privilege invoked by the People, (3) determine[d] which privileged matters, if any, were essential to the vindication of defendants' rights of confrontation and (4) create[d] a record adequate to review its ruling." (*Id.* at p. 532.)

In *Hammon*, *supra*, 15 Cal.4th 1117, the California Supreme Court disapproved of *Reber* to the extent it held the confrontation clause served as a basis for granting pretrial access to a victim's privileged psychotherapeutic records. It explained, "The court in *Reber* believed the confrontation clause of the Sixth Amendment (U.S. Const., 6th Amend.) as interpreted in *Davis v. Alaska* (1974) 415 U.S. 308 [ ], required pretrial disclosure of privileged information when the defendant's need for the information outweighed the patient's interest in confidentiality." (*Hammon*, at p. 1123.) Our high court held this was error, because the Sixth Amendment right of confrontation is a

trial right and thus did not confer a right to discover privileged information *before* trial. (*Id.* at pp. 1127, 1128.) Rather, access to such information must await a showing of materiality during trial, at a point when the trial court is better equipped to balance the defendant's need for cross-examination with the policies the privilege is designed to serve. (*Id.* at p. 1127.) *Hammon* has been interpreted to authorize a procedure under which "the trial court conducts an in camera hearing during trial to determine if the defendant's need for the material outweighs the statutory privilege." (*Facebook, Inc. v. Superior Court* (2017) 15 Cal.App.5th 729, 740.)

C. *Contentions on Appeal*

Sloat's arguments on appeal are somewhat difficult to characterize. After initially asserting the trial court erred by denying his motion for a new trial, he goes on to devote all of his arguments to establishing that the court erred when it declined to release the subpoenaed records of Jane's treatment at the hearing on the motion to quash. In this way, he appears to regard the court's denial of his new trial motion as a vehicle for challenging its earlier ruling on the prosecution's motion to quash.

Sloat's claims of error with respect to the motion to quash ruling rely on *Reber* and *Hammon*. He does not dispute that the records of Jane's treatment are privileged psychotherapeutic records. Instead, he contends the trial court erred by "fail[ing] to assess the . . . records pursuant to *Hammon-Reber*." More specifically, he claims the trial court erroneously "treated the claim of privilege as absolute" and failed to "balance[ ] [his] need for cross-examination with the policies the privilege is intended to serve." He asserts he "did not receive a fair trial" and asks us to conditionally reverse the judgment so the trial court can review the records anew and consider whether they contain anything relevant to Jane's credibility. Alternatively,

27

he asks us to conduct such a review. Conspicuously absent from his opening brief on appeal, however, is any developed argument addressing the trial court's stated concerns about the lack of notice to Jane.

The People respond that we can and should affirm the trial court's ruling on procedural or substantive grounds. Procedurally, they urge affirmance based on the defense's failure to notify Jane of its effort to obtain the records of her treatment. They point out the court explicitly invited the defense to renew its effort to obtain the records after first giving Jane notice, and yet it never did. Citing *Facebook*, the People contend Sloat "does not, nor could he, claim that notice to Jane was not required before the potential disclosure of her confidential records." Substantively, the People argue it is unclear whether and to what extent *Hammon* applies to a posttrial proceeding, but to the extent it does, the trial court reviewed the records as required and found no information that was exculpatory or that could have been used to impeach Jane. To the extent we choose to review the records ourselves, the People suggest we remand with an order that defense counsel should receive access to "whichever records should have been disclosed."

D. *Analysis*

As noted, although Sloat fails to clarify whether he is challenging the trial court's resolution of the prosecution's motion to quash or his motion for new trial, the thrust of his claim is that the court erred by declining to release Jane's treatment records at the conclusion of the hearing on the motion to quash. Rulings on both motions are reviewed under an abuse of discretion standard. (*People v. Verdugo* (2010) 50 Cal.4th 263, 308 ["the trial court has broad discretion in ruling on a new trial motion" and its "ruling will be disturbed only for clear abuse of that discretion"]; *Facebook, supra,* 10 Cal.5th at p. 359 ["We review a ruling on a motion to quash, like other

28

discovery orders, for abuse of discretion."].)  An abuse of discretion occurs if the court's decision is based on impermissible factors or an incorrect legal standard.  (*People v. Knoller* (2007) 41 Cal.4th 139, 156; see *Facebook*, at p. 359.)  We affirm because we agree with the People that Sloat has failed to establish the court relied on an impermissible factor when it refused to consider releasing any of Jane's treatment records to the defense until the defense first notified Jane it was seeking them.

It cannot seriously be questioned that Jane was entitled to such notice or that the trial court did not abuse its discretion by requiring it.  On appeal, Sloat has raised no dispute with the court's finding that the subpoenaed records of Jane's substance abuse treatment were privileged.  Releasing them to the defense would therefore have invaded Jane's privilege under Evidence Code section 1014 as well as her constitutional right of privacy (Cal. Const., art. I, §1; see *People v. Stritzinger* (1983) 34 Cal.3d 505, 511–512 (*Stritzinger*) [recognizing the psychotherapist-patient privilege as an aspect of the patient's constitutional right of privacy]).  Under Marsy's Law, Jane was guaranteed the right to prevent disclosure of such records.  (See Cal. Const., art. I, § 28, subd. (b)(4).)  And the California Supreme Court has repeatedly confirmed that Marsy's Law "contemplates that the victim . . . would be aware that the defense had subpoenaed confidential records regarding the victim from third parties."  (*Kling*, *supra*, 50 Cal.4th at p. 1080; accord *Facebook*, *supra*, 10 Cal.5th at pp. 347, 355.)

Our high court's holding in *Facebook*, that "in circumstances like those here [a subpoena seeking private social media messages of a crime victim] *it would be appropriate to inquire whether such notice has been, or should be, provided*" (*Facebook*, *supra*, 10 Cal.5th at p. 355, italics added) specifically confirms that a trial court acts appropriately when it considers the existence

of prior notice to a victim whose confidential psychotherapeutic records are sought by third party subpoena.

The facts of this case are sufficiently similar to those of *Facebook* to support the conclusion the trial court acted appropriately when it made such an inquiry here. Although *Facebook* involved a request for private social media communications whereas this case involves a request for privileged therapeutic treatment records, both requests implicate a crime victim's rights under Marsy's Law. Indeed the interest in maintaining the confidentiality of the records at issue in this case is arguably stronger than in *Facebook*, as the statutory privilege that protects such records from disclosure serves the additional public goal of encouraging patients to seek professional assistance. (See *Stritzinger, supra*, 34 Cal.3d at p. 511; *People v. Superior Court* (*Humberto S.*) 43 Cal.4th 737, 753 [describing the victim's statutory and constitutional interest in the privacy of her communications with her therapist as "considerable"].) It follows that the trial court in this case did not abuse its discretion when, after determining Jane had not yet been properly notified of the efforts to obtain her privileged treatment records, it required that she be provided with such notice before it would consider releasing them.

We do not discern anything unreasonable about the manner in which the trial court handled the notice issue. The court did not foreclose the possibility of the defense obtaining the records due to the lack of notice. To the contrary, as the People point out, the court repeatedly invited the defense to seek release of the records anew by filing a motion and giving notice to Jane. But rather than take this opportunity, the defense filed a motion for new trial claiming the court had wrongfully deprived it of access to Jane's treatment records. In doing so, the defense risked the possibility that an

30

appellate court would later rule the trial court was justified in requiring that notice to Jane precede any release of her records.

On appeal, rather than directly challenge the trial court's ruling requiring him to give notice before it would revisit the issue of releasing Jane's treatment records, Sloat has mostly sidestepped it. In his opening brief on appeal, he quotes the court's ruling but does not go on to present a developed argument that the court erred by requiring him to give notice to Jane. He does not mention *Facebook* or Marsy's Law, despite having cited both authorities repeatedly in his own trial court briefs. In his reply brief on appeal, in response to the People's reliance on *Facebook* (and indirectly, Marsy's Law) as authority supporting the court's notice ruling, Sloat asserts that we should follow a treatise,[10] or *Hammon-Reber*, instead. But treatises are persuasive authority at best and cannot supplant our state's constitution or a controlling decision of our high court. (See *Aixtron, Inc. v. Veeco Instruments Inc.* (2020) 52 Cal.App.5th 360, 400.) And both *Hammon* and *Reber* predated Marsy's Law and therefore had no occasion to consider its impact on a court's decision to grant access to a crime victim's privileged records. They are therefore not authority for the proposition that a trial court abuses its discretion by requiring that the victim be notified before such

---

[10] He asserts the procedure for obtaining privileged psychiatric records is outlined in a practice guide that states, in relevant part, "[t]he defense may secure the privileged psychiatric medical records of prosecution witnesses if the defense can show good cause for discovery of the records" and "[t]he motion for the disclosure of these records is known as a '*Hammon-Reber* motion.'" (Cal. Crim. Law: Procedure and Practice (Cont.Ed.Bar OnLAW 2023) Motion to Obtain Privileged Psychiatric Records (*Hammon-Reber* Motion), § 11.29.)

access is granted.  (*People v. Thomas* (2021) 64 Cal.App.5th 924, 945, fn. 6 [" 'Cases are not authority for propositions not considered.' "].)

In short, Sloat opted not to notify Jane of the effort to obtain her confidential records and has now failed to establish that the trial court abused its discretion, or violated his state or federal constitutions rights, by requiring him to do so or by denying his motion for new trial in which he claimed wrongful deprivation of access to the documents.  Because it is apparent the court's ruling can and should be affirmed on this ground, we conclude our inquiry and decline the invitation to independently review the 1,395 pages of records.

## III.

### *Asserted Sentencing Errors*

A.  *Remand for Resentencing Under Section 1170, New Subdivision (b) Is Required*

The trial court sentenced Sloat to a total prison term of 12 years and eight months.  It selected count 3 as the principal count and imposed the upper term of eight years, consecutive to sentences of one year, four months each on counts 1 and 2 (one-third the middle term of four years) and two years on count 4 (one-third the middle term of six years).

In sentencing Sloat to the upper term of eight years on count 3, the trial court identified five factors in aggravation and no factors in mitigation as the reason for its sentencing decision.[11]  The aggravating factors were set

---

[11]    The factors in aggravation were:  (1) the victim was particularly vulnerable; (2) the defendant's prior convictions are numerous or of increasing seriousness; (3) the defendant has served a prior term in prison or county jail; (4) the defendant was on probation, mandatory supervision, post release community supervision, or parole when the crime was committed; (5) the defendant's prior performance on probation, mandatory supervision, post

forth in the probation report, and were neither stipulated to by Sloat nor found true by a jury beyond a reasonable doubt.

At the time Sloat was sentenced, section 1170, subdivision (b), left it to the sentencing judge's "sound discretion" to select the appropriate term within a sentencing triad that "best serves the interests of justice." (§ 1170, former subd. (b), as amended by Stats. 2018, ch. 1001 (Assem. Bill No. 2942) § 1.) While Sloat's appeal was pending, however, Senate Bill 567 was enacted. Senate Bill 567 amended section 1170, subdivision (b), to limit the situations under which an upper-term sentence could be imposed.

Effective January 1, 2022, a "court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).) Bifurcation of such jury findings is also now required. (*Ibid.*) However, under the newly amended law, "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3).)

The amendments to section 1170, subdivision (b), implemented by Senate Bill 567 are ameliorative and apply retroactively to Sloat's sentence under the rule of *In re Estrada* (1965) 63 Cal.2d 740, pursuant to which we presume absent a contrary indication from the Legislature that ameliorative

---

release community supervision, or parole was unsatisfactory. (Cal. Rules of Court, rule 4.421(a)(3), (b)(2)–(5).)

enactments apply retroactively to all defendants whose sentences are not final on the enactment's operative date. (See, e.g., *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039; *People v. Lopez* (2022) 78 Cal.App.5th 459, 465 (*Lopez*); *People v. Jones* (2022) 79 Cal.App.5th 37, 45 [defendant whose convictions remained nonfinal on appeal "entitled to retroactive application of the ameliorative changes effected by Senate Bill 567"].)

The People argue, however, that despite retroactive application of newly amended section 1170, subdivision (b), to Sloat's sentence, remand for resentencing is not required because the trial court's failure to sentence him in accordance with the new sentencing procedure was harmless error. They rely on the harmlessness analysis articulated in *Lopez*, *supra*, 78 Cal.App.5th 459, and *People v. Zabelle* (2022) 80 Cal.App.5th 1098 (*Zabelle*).

In *Lopez*, we set forth the following two-step prejudice test: "[T]he initial relevant question for purposes of determining whether prejudice resulted from failure to apply the new version of the sentencing law is whether the reviewing court can conclude beyond a reasonable doubt that a jury would have found true beyond [a] reasonable doubt *all* of the aggravating factors on which the trial court relied in exercising its discretion to select the upper term. If the answer to this question is 'yes,' then the defendant has not suffered prejudice from the court's reliance on factors not found true by a jury in selecting the upper term. However, if the answer to the question is 'no,' we then consider [a] second question, which is whether a reviewing court can be certain, to the degree required by [*People v. Watson* (1956) 46 Cal.2d 818, 836], that the trial court would nevertheless have exercised its discretion to select the upper term if it had recognized that it could permissibly rely on only a single one of the aggravating factors, a few of the aggravating factors, or none of the aggravating factors, rather than all of

34

the factors on which it previously relied.  If the answer to both of these questions is 'no,' then it is clear that remand to the trial court for resentencing is necessary." (*Lopez*, *supra*, 78 Cal.App.5th at p. 467, fn. 11.)

*Zabelle* devised a two-step prejudice test very similar to the *Lopez* test, except that it applies a slightly different analysis at the first step.  Whereas step one of the *Lopez* test would have the reviewing court consider whether, to the degree of certainty required by *Chapman v. California* (1967) 386 U.S. 18, all aggravating factors relied upon by the trial court would have been found true beyond a reasonable doubt by a jury, *Zabelle* held the reviewing court need identify only a single aggravating factor that withstands such analysis.  (*Zabelle*, *supra*, 80 Cal.App.5th at pp. 1111–1112.)  Under *Zabelle*, if the court identifies one such factor, it then, "for each [of the remaining] aggravating fact[ors], consider[s] whether it is reasonably probable [(i.e., the degree of certainty required by *Watson*)] that the jury would have found the fact not true." (*Id.* at p. 1112.)  The reviewing court "must then, with the aggravating facts that survive this review, consider whether it is reasonably probable that the trial court would have chosen a lesser sentence had it considered only these aggravating facts." (*Ibid.*)  In short, whereas the *Lopez* test applies *Chapman* harmlessness analysis to all aggravating factors at step one, the *Zabelle* test applies *Chapman* to the first aggravating factor, and *Watson* to the rest.  Both the *Lopez* and *Zabelle* tests rely on *Watson* harmlessness analysis at step two.

In this case, it is clear that reversal is required under either test.  Of the five aggravating factors relied upon by the trial court (see footnote 11, *ante*), the People identify only three that arguably survive the first level of harmlessness analysis under *Lopez* or *Zabelle*:  Jane's vulnerability; Sloat's

35

record of convictions; and Sloat was on probation when he sexually assaulted Jane. (See Cal. Rules of Court, rule 4.421(a)(3), (b)(2), (b)(4).)

Even if we assume the People are correct, on this record we cannot conclude to a reasonable degree of certainty that the trial court would have found these three factors sufficient to warrant exercising its discretion to select the upper term. At sentencing, the court did not elaborate on its sentencing decision. It simply stated that it had selected an upper term sentence of eight years, and then identified as the reasons for its sentencing decision the five aggravating factors it found to be true as well as the absence of any mitigating factors. As in *Zabelle*, "[t]he trial court gave no particular weight to any of its listed aggravating circumstances. Nor did it indicate whether its decision to impose the upper term was (or was not) a close call." (*Zabelle*, *supra*, 80 Cal.App.5th at p. 1115.) On this record, we can discern nothing more than that the court meant what it said, and that its sentencing discretion was based on the existence of five sentencing factors, which suggests there is at least a reasonable likelihood it would have imposed a lesser sentence if the number of aggravating factors available to support its sentencing decision was reduced.

Because we cannot determine to the degree of certainty required by *Watson* whether the trial court would have issued the same sentence had it been left with only three aggravating factors, we cannot affirm the upper term sentence on count 3. (*Zabelle, supra,* 80 Cal.App.5th at p. 1115; *Lopez, supra,* 78 Cal.App.5th at p. 468.) We will instead vacate Sloat's sentence and remand so that he can be resentenced under the current version of section 1170, subdivision (b). On remand, the procedures set forth in *Lopez* shall apply. (See *Lopez*, at pp. 468–469.) Further, our remand for resentencing triggers the full resentencing rule. (See *People v. Buycks* (2018) 5 Cal.5th

857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "].)

B. *Sloat Will Have the Opportunity to Object to Multiple Punishment of Counts 2, 3, and 4 on Remand*

The trial court ruled that section 654 did not apply to any of Sloat's offenses because he "committed several wrongful acts against one victim on one continu[ous] occasion" and the elements of each of the five counts of conviction "involve different operative facts." Sloat contends this ruling was erroneous because his conviction on count 2 (assault with intent to commit sexual penetration or oral copulation) relied on the "exact same acts" as his convictions on counts 3 (sexual penetration by force, fear, or threats) and 4 (oral copulation by force, fear, or threats).[12]

At the time of Sloat's sentencing, former section 654, subdivision (a),[13] provided in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Although this provision by its terms applies only to punishment arising from the " ' "same act or omission," ' " its protection " 'has been extended to cases in which there are several offenses committed during "a course of conduct

____

[12]    Sloat did not object to the sentencing decision in the trial court, but this is not a barrier to his ability to challenge it on appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17 (*Scott*).)

[13]    As we later explain, since the time of Sloat's sentencing, section 654 has been amended by a new legislative enactment.

deemed to be indivisible in time." ' " (*People v. Hicks* (1993) 6 Cal.4th 784, 789.)

"  'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Britt* (2004) 32 Cal.4th 944, 951–952; see also *id.* at p. 952 [a defendant may be held to have harbored separate objectives if the objectives were "different even if simultaneous"].)

Additionally, in sex crime cases, "[e]ven where the defendant has but one objective—sexual gratification—section 654 will not apply unless the crimes were either incidental to or the means by which another crime was accomplished." (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1006 (*Alvarez*), citing *People v. Perez* (1979) 23 Cal.3d 545, 553; see *People v. Harrison* (1989) 48 Cal.3d 321, 335–338 [section 654 did not preclude multiple punishment where defendant committed three acts of forcible sexual penetration against a single victim during a continuous seven- to 10-minute attack where each repenetration was preceded by breaks in the activity]; *People v. Siko* (1988) 45 Cal.3d 820, 826 (*Siko*) [separate punishment for lewd conduct impermissible where it was understood at trial to consist of the rape and sodomy of which defendant was also convicted]; *People v. Greer* (1947) 30 Cal.2d 589, 604 [multiple punishment for both lewd and lascivious conduct and rape precluded because the act giving rise to the lewd conduct, removal of the victim's underclothing, was merely incidental to the subsequent rape].) This is because a "defendant who attempts to achieve sexual gratification by committing a number of base criminal acts on his victim is substantially

more culpable than a defendant who commits only one such act." (*Perez*, at p. 553.)

As a general matter, "a trial court may base its decision under section 654 on *any* of the facts that are in evidence at trial, without regard to the verdicts." (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1340.) We review the court's explicit or implicit factual determinations for substantial evidence. (*Id.* at p. 1338; *People v. Osband* (1996) 13 Cal.4th 622, 731; *People v. Lopez* (2011) 198 Cal.App.4th 698, 717.) Here, however, Sloat does not contend that substantial evidence in the record does not support the court's sentencing decision. Instead, he relies on a seldom-invoked rule that "where there is a basis for identifying the specific factual basis for a verdict, a trial court cannot find otherwise in applying section 654." (*McCoy*, at p. 1339, citing *Siko, supra,* 45 Cal.3d 820; see *McCoy*, at p. 1339 [noting the infrequency with which this holding from *Siko* had been invoked].)

Sloat's claim that the trial court erred in finding section 654 did not apply to count 2 is based exclusively on the prosecutor's closing arguments to the jury about the factual basis of counts 2, 3, and 4. The prosecutor argued to the jury that Sloat had committed count 3 (sexual penetration) and count 4 (oral copulation) by means of fear.[14] She stated that "Jane Doe was afraid when Mr. Sloat came into her room, got into her bed, placed his body against her," and argued Jane's fear was reasonable because Jane was alone and there was a substantial disparity in size between her and Sloat.

---

[14] The jury instructions for counts 3 (sexual penetration in violation of section 289, subdivisions (a)(1), (a)(2), and (g)) and 4 (oral copulation in violation of section 287, subdivisions (c)(2), (c)(3), and (k)) stated each offense is "*accomplished by fear* if the other person is actually and reasonably afraid or she is actually but unreasonably afraid and the defendant knows of her fear and takes advantage of it." (See CALCRIM Nos. 1015, 1045.)

As to count 2 (aggravated sexual assault), the prosecutor told the jury it could infer Sloat entered Jane's room with the intent to commit oral copulation or sexual penetration from the fact he later committed both acts. She explained this offense required proof of an "act that would result in the application of force to someone." She argued: "[W]hen he got in that bed, when he placed his body behind her and began moving his hands along her torso and shoulder and her chest, . . . he was touching her body and it was an assault. In each of those he did an act that by its nature would result in the application of force to a person." She further argued: "He intended when he touched her, when he climbed into the bed, placed his body behind hers, placed his hands along her torso and her shoulders and her chest area, he intended to commit a sexual penetration or oral copulation."

Relying on these closing arguments, Sloat contends the prosecutor "used the exact same acts" to prove the commission of counts 2, 3, and 4, and that the trial court therefore erred when it found the counts were based on different acts. In claiming section 654 was violated, Sloat principally relies on two cases: *Siko* and *Alvarez.*

In *Siko*, our high court held section 654 precluded separate punishment for defendant's convictions of forcible lewd conduct, rape, and sodomy because the forcible lewd conduct was understood at trial to "consist[ ] only of" the acts of rape and sodomy. (*Siko, supra*, 45 Cal.3d at p. 823.) The People argued the evidence at trial showed the defendant committed other acts (twisting a handkerchief around the victim's neck; taking off her clothes) that supplied an independent basis for the lewd conduct conviction. (*Id.* at p. 825.) The Court disagreed that separate sentencing could be upheld on the basis of these acts. The jury's verdict, which conformed to the charges in the information, included a specific finding the lewd act in question was

40

" 'penetration of the vagina and rectum of the victim by the penis.' " (*Id.* at p. 826.) "Thus the charging instrument and the verdict both identify the lewd conduct as consisting of the rape and the sodomy rather than any other act. Nor did anything in the prosecutor's closing argument or in the court's instructions suggest any different emphasis." (*Ibid.*)

*Alvarez* held, in part, that section 654 applied to two counts of forcible lewd conduct based on two incidents in which the defendant forcibly penetrated a child. (*Alvarez, supra*, 178 Cal.App.4th at pp. 1002–1003.) The defendant was also convicted of aggravated sexual assault based on the same incidents. "As the court recognized at the time of sentencing, those two counts of forcible lewd conduct were based on the very same acts of digital penetration which formed the basis for the two counts of aggravated sexual assault[.]" (*Id.* at p. 1007.) Since these forcible lewd acts "were the very means by which" the aggravated sexual assaults were accomplished, the defendant could not be punished for them more than once. (*Ibid.*)

Here, Sloat relies on the prosecutor's closing argument rather than any other aspect of the record as a means of circumscribing the universe of facts available to support each of the offenses, on the apparent theory that in tying each count to specific acts, the prosecutor made an election. (See *People v. Bradley* (2003) 111 Cal.App.4th 765, 770 [trial court could not rely for its section 654 sentencing decision on theory the defendant entertained a specific intent to attempt the victim's murder where the prosecutor, by arguing the defendant was liable as an aider and abettor of the murder under a natural and probable consequences theory, "elected not to submit that possibility to the jury"]; *Siko, supra*, 45 Cal.3d at p. 826 [identifying prosecutor's closing argument as a source from which the factual basis for jury's lewd conduct verdict could be determined].) In Sloat's view, the jury's verdict must be

41

interpreted as though it was based on the acts the prosecutor selected to support each count. Because the prosecutor relied on "[t]he coming into the room, getting into bed, and placing his body against Jane Doe's . . . as fulfilling the elements of [counts 2, 3, and 4]," the trial court erred when to the extent it ruled these counts of conviction "involve different operative facts."

In their responsive brief, the People do not address whether Sloat's approach to demonstrating sentencing error is tenable, and they ignore his reliance on *Siko*. Rather than confront Sloat's arguments, they simply assert that our review of the trial court's sentencing decision is for substantial evidence. Relying on a different holding from *Alvarez* than the one relied on by Sloat, they contend the record is "entirely susceptible of the interpretation" that Sloat touched Jane's torso, chest, and shoulders for reasons unrelated to accomplishing the oral copulation or sexual penetration, such as "for the purpose of his own arousal." (See *Alvarez*, *supra*, 178 Cal.App.4th at p. 1007 [section 654 did not preclude separate punishment of lewd acts based on kissing, digital penetration, and forced fondling, where the record was "entirely susceptible of the interpretation" defendant kissed the victim for the purpose of his own arousal and not to facilitate other sexual contact, "although that is where things ultimately led"].) Thus, whereas Sloat claims the court's section 654 error arose when it relied on different *acts* than the acts assertedly embraced by the jury's verdict, the People seek to support the court's sentencing decision on the ground Sloat, in committing the sex crimes charged in counts 2, 3, and 4, inferably acted with different even if simultaneous *objectives*.

We have concerns about deciding this issue on this record, on the basis of these discordant arguments. Moreover, as we have mentioned, at the

42

sentencing hearing Sloat did not object to the trial court's decision that section 654 did not bar multiple punishment. Although his inaction does not result in a forfeiture of the issue (*Scott, supra*, 9 Cal.4th at p. 354, fn. 17), it does mean that the sentencing court did not have the opportunity to consider the possible barriers to multiple punishment. And the record is devoid of any indication the court considered the factual theory proffered by the People here, namely that Sloat committed the aggravated sexual assault for reasons unrelated to furthering his goal of committing the oral copulation or digital penetration. On this record, were we to determine this factual issue for ourselves, we would be deciding it in the first instance. We decline to do so.

As we have already discussed, the matter must be remanded for full resentencing under section 1170, subdivision (b). In addition, effective January 1, 2022, section 654, subdivision (a), was amended by Assembly Bill No. 518 (2021–2022 Reg. Sess.) to remove the requirement to impose the longest prison term. (Stats. 2021, ch. 441, § 1.) It now provides that "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd (a).) On remand, the parties and the trial court will have the opportunity to address application of amended section 654. We leave it to the trial court to make the factual determinations necessary to support its sentencing decision.

C.    *Sloat May Challenge the Imposition of Fines and Fees at Resentencing*

Relying on *Dueñas, supra*, 30 Cal.App.5th 1157, Sloat argues the trial court unconstitutionally imposed certain fines and fees without first holding a hearing as to whether he had the ability to pay them. He further argues we should remand his case so the court can hold such a hearing and make a determination of his ability to pay the fines and fees. At the same time, he

43

concedes he did not object to the imposition of the fines or fees, and the record does not disclose that he requested an ability-to-pay hearing. We need not address these contentions because this case is being remanded for full resentencing, at which time Sloat may raise his challenge to the imposition of fines and fees in the first instance.

## DISPOSITION

The sentence is vacated. The case is remanded for resentencing consistent with this opinion. In all other respects, the judgment is affirmed.

DO, J.

WE CONCUR:

McCONNELL, P. J.

DATO, J.

44